UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

01 NOV -8 AM 11:01

U.S. DISTRICT COURT
N.D. OF ALABAMA

MARY L. CARTER; and                    )
SHIRLEY L. GILSTRAP,                   )
                                       )
              Plaintiffs,              )
                                       )
vs.                                    )          Civil Action No. CV-99-S-3145-NE
                                       )
KENTUCKY CLEANING                      )
MANAGEMENT, INC.; and                  )
MANAGEMENT CLEANING                    )
CONTROLS, INC.,                        )          ENTERED
                                       )
              Defendants.              )          NOV - 8 2001



## MEMORANDUM OPINION

Plaintiffs, Mary L. Carter and Shirley L. Gilstrap, were first promoted by defendants to janitorial supervisory positions, later demoted, and, ultimately, terminated for allegedly taking unauthorized breaks and performing their duties in a manner that elicited complaints from their employer's client. Plaintiffs, who are American citizens of African ancestry ("black"), contend that defendants discriminated against them on the basis of their race, and thus violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. The action presently is before the court on defendants' motion for summary judgment. Upon consideration of the pleadings, evidentiary submissions, and briefs, this court concludes the motion is due to be granted.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits any party to a civil action to move for summary judgment upon a claim, cross-claim, or counterclaim on which there is no genuine issue of material fact, and upon which the moving party is entitled to prevail as a matter of law.

The judgment sought *shall be rendered forthwith if* the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c) (emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the

entry of summary judgment, after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*,

477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The motion pierces the pleadings,

and "strikes at the heart of the claim. In effect it argues that as a matter of law upon admitted or

established facts the moving party is entitled to prevail." Charles Alan Wright, *Law of Federal

Courts* § 99, at 705 (5th ed. 1994).

The moving party bears the initial burden of showing the court, by reference to materials on

file, that no genuine issues of material fact exist to be decided at trial. *See, e.g., Celotex*, 477 U.S.

at 323, 106 S.Ct. at 2553; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The

movant discharges this burden by "showing" or "pointing out" to the court that there is an absence

of evidence to support the opposing party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590,

593 (11th Cir. 1995) (*per curiam*). Rule 56 permits the movant to discharge this burden with or

without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

When the moving party has discharged its burden, the opposing party must go beyond the

pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery*, 64 F.3d

at 593. The non-moving party must put forth more than a "mere 'scintilla'" of evidence; instead,

"there must be enough of a showing that the jury could reasonably find for that party." *Walker v.

Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

2

When deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-moving party, and to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover, inferences that are "merely colorable," *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), *Brown v. City of Clewiston*, 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Johnson v. Fleet Finance, Inc.*, 4 F.3d 946, 949 (11th Cir. 1993), *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, do not create a genuine issue of material fact. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corporation v. Dunmar Corporation*, 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). In short, to avoid summary judgment, the opposing party must come forward with specific facts that are "material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicious." *American Lease Plans, Inc. v. Silver Sand Co. of Leesburg, Inc.*, 637 F.2d 311, 315 (5th Cir. 1981).[1]

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v. Employers Insurance of Wausau*,

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

3

835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510).

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (quotation marks and citations omitted)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

With the foregoing standards in mind, the following facts either are not disputed or are stated in a light most favorable to plaintiffs.

## II. STATEMENT OF FACTS

Plaintiffs, Mary L. Carter and Shirley Gilstrap, were employed by defendants, Kentucky Cleaning Management, Inc. and Management Cleaning Controls, Inc., as members of defendants' maintenance staff.[2] The exact relationship between the two defendants is not precisely defined in the record. It appears that Management Cleaning Controls has undergone various business combinations and changes in corporate form. Its president, James L. Bramble, explained that the

---

[2] Complaint at 2.

4

company does business under the name (or through the subsidiary known as) "Kentucky Cleaning Management, Inc.," but that the parent entity now is known as "Management Cleaning Controls, LLC," rather than "Management Cleaning Controls, Inc."[3] For convenience, therefore, these entities will be referred to throughout this opinion either as "defendants" or "MCC."

At all times relevant to this action, MCC was an independent, commercial cleaning company that contracted with (among others) Castner-Knott for the performance of janitorial services at its Huntsville, Alabama store, located in the Madison Square Mall.[4] The term of the contractual arrangement was month-to-month, terminable by Castner-Knott on 30 days notice.[5]

Since her graduation from high school in 1986, Mary L. Carter ("Carter") has worked largely for janitorial and cleaning services in the vicinity of Huntsville, Alabama. Before joining MCC's janitorial crew, she was a janitorial employee of "Ferguson and Williams Cleaning Service," which performed janitorial services for the Sears store in Madison Square Mall. She worked in that capacity for four years and was paid minimum wage. She did much the same work for one year, for the same wage, for "Riteway Cleaning Service" at Teledyne-Brown Engineering Company. Carter also had two years experience working as an Assembler and Inspector, a $5.00 an hour production job that entailed contract assembly work for Chrysler.[6]

Carter joined MCC in September of 1995, as a janitorial worker assigned to the Castner-Knott store cleaning crew.[7] She was paid $6.00 an hour until her elevation to an assistant supervisor

---

[3] Plaintiffs' evidentiary submission, Tab 7 (Bramble deposition), at 2-3.

[4] *Id.*, Tab 3 (Letter to EEOC of June 25, 1998), at 1. Caster-Knott has since become "Dillard's" department store in Huntsville, Alabama.

[5] *Id.*

[6] *Id.*, Tab 5 (Vocational assessment report for Carter), at unnumbered page 1.

[7] *Id.*, Tab 1 (Carter affidavit), at unnumbered page 1.

5

position. She earned the promotion soon after she was hired by MCC. Carter was promoted once again to a higher supervisory position — known within MCC as "account manager" — in July of 1997, for which she was paid $9.00 an hour.[8] In November of 1997, however, Carter was demoted to her original position as a member of MCC's janitorial crew, although she was paid $6.50 an hour for her work thereafter.[9] She was fired from her job altogether on January 3, 1998, after MCC's client — Castner-Knott — complained that she was taking unauthorized breaks, during which she was seen talking to other employees instead of working.[10]

Shirley L. Gilstrap ("Gilstrap") did not complete high school, although she studied for two years at a trade school in "Commercial Foods Training."[11] Since that time, Gilstrap, like Carter, has worked in various janitorial positions, including for two years with Ferguson and Williams at the Madison Square Mall Sears store, where she was paid minimum wage. Her past work experience also included positions as a babysitter and housecleaner for a private individual,[12] and electronic assembly work for Magnetek and SCI, where she earned $6.00 an hour.[13]

Gilstrap joined MCC as a janitorial crew member in August of 1995, one month prior to Carter. Like Carter, she was assigned to the Castner-Knott store at Madison Square Mall. Unlike Carter, she initially was paid minimum wage. Once MCC promoted her to assistant supervisor in July of 1997, Gilstrap's pay increased to $6.00 an hour.[14] She was demoted from that position in

---

[8] *Id.*, Tab 10 (Carter deposition), at 21, 41; *see also* Tab 3 (June 25, 1998 Letter to EEOC).

[9] *Id.*, Tab 4 (June 25, 1998 Letter to EEOC).

[10] *Id.*, Tab 5 (Vocational assessment report for Carter), at 2.

[11] *Id.*, (Vocational assessment report for Gilstrap), at unnumbered page 1.

[12] *Id.*

[13] *Id.*

[14] *Id.*, Tab 3 (June 25, 1998 Letter to EEOC).

October of 1997, however, and was terminated on January 3, 1998, after the client complained that she was taking unauthorized breaks.[15]

Both plaintiffs were hired as "at-will" employees by Elizabeth Welch, a white female and MCC account manager at the Huntsville Castner-Knott store.[16]   Welch resigned her position with MCC just prior to July of 1997.[17]   (Welch now is known as "Elizabeth Willis," but will be described here as "Welch" to avoid confusion when the court discusses her present husband and MCC regional manager and vice-president, Richard Willis.)

Upon her departure, Welch recommended that Carter replace her as account manager,[18] and Carter was elevated to that position in July of 1997.  Welch described her relationship with Carter during deposition in the following manner:

> Q.   Do you recall Mary Carter?
>
> A.   Very well.
>
> Q.   And did she work as an assistant account manager under you?
>
> A.   Yes.
>
> Q.   And what was her work performance like?
>
> A.   Excellent.
>
> Q.   Was it your recommendation to have her promoted to account manager when you had to leave?
>
> A.   Yes, it was.
>
> Q.   Did Mary Carter have to fill in as a supervisor when you were away from

---

[15] Id.

[16] Plaintiffs' evidentiary submission, Tab 3 (June 25, 1998 letter to EEOC), at 2.

[17] Id., Tab 8 (Welch deposition), at 33.

[18] Id.

7

work?

A.   Yes. I would go to several other accounts helping other stores such as Nashville, Florence, Decatur, and she would act as the account manager while I was gone.  She did a very good job, she handled the other crew members very well, she was very accurate, she was there on time, I had no problems with her.

Q.   Was she reliable, as far as getting to the store even in bad weather?

A.   Yes.

Q.   Was Mary Carter an exception to that rule, was she reliable?

A.   Yes.  As a matter of fact, I lived in Hartselle and, of course, to Huntsville it is about 30 miles to the job.  I recall one time it was snowing, we had a lot of snow on the ground.  Castner-Knott went ahead and opened.  And I called Mary and asked her, and she went ahead and took a taxi to be there at the store.  She was very reliable.[19]

Welch also recommended that Gilstrap be promoted to assistant account manager under

Carter, a position to which Gilstrap ascended in July of 1997.  According to Welch, "Shirley

[Gilstrap] was a very good employee also."[20]

Q.   Was it your recommendation to have Shirley Gilstrap promoted to assistant account manager?

A.   Yes, actually it was.

Q.   And was she also a reliable employee and a good worker?

A.   Yes.

Q.   And do you recall if she ever had any poor work history while working for you?

A.   Not to the best of my knowledge.  She had a few personal problems that may

---

[19] *Id.* at 10-11.

[20] *Id.* at 11.

have interfered with her life, but other than that she was a good worker.[21]

Just before Welch left MCC's employ, she gave Carter and Gilstrap some parting advice. She warned them about Castner-Knott's head of security, Tim Miller, a white male. According to Carter and Gilstrap:

> Welch had indicated in the past that Tim Miller often made negative comments concerning black employees in the store, and that he refrained from focusing such comments toward white employees. Tim Miller would implicate black employees of wrong-doing in the store, without any evidence to link the wrong-doing to a black employee.[22]

As Welch explained during her deposition:

A.   Tim Miller was head of Security ... he was constantly harassing me occasionally. He was the type of person that because he was over Security he thought he was upper management. He would run to the manager of the store, anything and everything regarding cleaning.

So as far as Tim Miller, I never heard it come out of his mouth, but I do believe that he was even probably very prejudiced.

...

Q.   Was Tim Miller a security employee for Castner-Knott at the time that you were an account manager?

A.   Yes.

Q.   And as head of Security was he a Castner-Knott employee?

A.   Yes.

Q.   And that's like inventory control, basically, he was looking for shoplifters and that type of thing; is that what he does?

A.   Yes, that's what he does.

---

[21] *Id.* at 17-18.

[22] Plaintiffs' evidentiary submission, Tabs 1 and 2 (Carter and Gilstrap affidavits), at unnumbered pages 1.

Q.    So he would be around the store, basically, watching everybody all the time; is that correct?

...

A.    Correct.

Q.    Did he continue to serve as Castner-Knott's head of security after you left?

A.    Yes.

Q.    Did Tim Miller ever complain about you personally to Castner-Knott's store manager?

...

A.    Me personally, no, my employees, yes.

Q.    Would he complain more about your black employees?

...

A.    Well, 90 percent of my employees were black, so, yes.

Q.    Did you specifically ever hear Mr. Miller make any derogatory or racial comments?

...

A.    No.

Q.    On what basis do you suspect that he may have some racial bias?

...

A.    Because, like I said, mainly he really harassed the cleaning people a lot. And, like I said, 90 percent of them were black. I just formed that opinion of him.

Q.    How would he harass them?

A.    Watch every move they made. For instance, something had come up stolen out of the — I can't think of her job description — anyway, something had come up missing from another Castner-Knott employee. Of course, my

10

people were blamed for it.

Q.      Was that ever resolved?

A.      It was solved, and it was my housekeeper, but she was white.

Q.      And that was one incident where a cleaning person had actually taken something?

...

A.      A white one, and he was trying to say one of the crew people, yes.

Q.      So he was trying to blame black employees for this?

...

A.      Yes.  That's the impression I got.[23]

Welch also warned plaintiffs to "watch [their] step" around the Castner-Knott store manager, John Stanley ("Stanley").[24] Welch explained her opinion of Stanley, whose complaints were largely responsible for plaintiffs' termination, as follows:

Q.      Was [Stanley] a difficult manager to work with?

A.      No.

...

Q.      Do you recall if John Stanley had higher standards for his store's cleanliness than other managers had?

...

A.      Yes.

Q.      In that respect, as far as keeping the store up to John Stanley's standards, was he a more difficult Castner-Knott manager to work with?

---

[23] Plaintiffs' evidentiary submission, Tab 8 (Welch deposition), at 18-23.

[24] *Id.*, Tabs 1 and 2 (Carter and Gilstrap affidavits).

11

A.    He did expect more than other managers there, yes, he was.

Q.    Did you ever discuss that with [Carter], the fact that John Stanley was
      coming over to her store and that there might be a problem?

...

A.    Not really.  I told [Carter] and which she knew because, you know, she was
      my assistant, that she had watched me a lot, you know, you had to keep in
      constant contact with management to make sure they were happy and didn't
      have any comments. ...[25]

Plaintiffs' complaints of race discrimination focus on their treatment by Stanley.  Plaintiffs

contend that Stanley did not communicate with them about the store's cleaning needs, even though

it would have been customary for a store manager to relay comments and concerns to the MCC

supervisory staff, and even though they believed him to be in direct communication with other white

supervisory personnel.[26]

Plaintiffs' complaints regarding Stanley also center on the store manager's reaction when he

was first introduced to plaintiffs.  According to Carter: "When John Stanley first met my assistant

supervisor [Gilstrap] and [me], and first discovered that we were black, John Stanley was visibly

surprised."[27]

As far as Castner-Knott's head of security is concerned, plaintiffs assert that Castner-Knott's

store manager

      used Tim Miller to monitor us and based his evaluation of us on [Miller's] biased and
      prejudiced report.  John Stanley never spoke with us about a problem with our
      performance. [MCC regional manager and vice president] Richard Willis indicated
      to us that Stanley had complained about the cleaning of his office, but Stanley never

---

[25] Plaintiffs' evidentiary submission, Tab 8 (Welch deposition), at 13, 14-15.

[26] Id.; see also id., Tab 11 (Gilstrap deposition), at 24.

[27] Id.; Tab 1 (Carter affidavit), at unnumbered page 1.

relayed that complaint to on-site personnel.[28]

During October of 1997, Gilstrap was demoted from assistant account manager to the janitorial crew, although without a reduction in pay. She was replaced by another black employee, Carla King, who was promoted from the janitorial crew to the assistant supervisor position.[29] Carter also was demoted in October of 1997, but she was replaced by a white employee: an MCC account manager at the Decatur, Alabama, Castner-Knott store, Patricia Congo.[30]

Carter and Gilstrap were employed by defendants for three years prior to their termination on January 3, 1998.[31] The demotion and subsequent termination of plaintiffs was carried out in response to complaints that both were seen talking to other employees, or taking unauthorized breaks, rather than performing their duties. Included in plaintiffs' employment files are copies of written warnings that document some of these alleged unauthorized breaks. According to those records, Gilstrap and Carter were reprimanded on November 21, 1997, and again on December 30, 1997, for client complaints stemming from plaintiffs' "standing around talking."[32] The November 21 warnings for both plaintiffs record that Carter and Gilstrap had been "standing around talking over 30 minutes. Client complained."[33] The December 30 warnings also read similarly for both plaintiffs: "Standing around talking. Was told not to. Client complained."[34] All four warning slips were signed by Patricia Congo, the new supervisor, but neither plaintiff signed the slips to

---

[28] *Id.*, Tabs 1 and 2 (Plaintiffs' affidavits), at unnumbered pages 1-2.

[29] *Id.*, Tab 3 (June 25, 1998 letter to EEOC), at unnumbered page 1.

[30] *Id.* at 1-2.

[31] Motion to Amend Complaint at ¶ 1.

[32] *Id.*, Tab 6 (personnel file warnings).

[33] *Id.*

[34] *Id.*

13

acknowledge their receipt of the complaints.  The employee termination report for both plaintiffs, dated January 3, 1998, gave as its reason for the terminations that plaintiffs had been "[written] up for standing around talking, *store manager wanted to get rid of.*  Every time he saw [Carter and Gilstrap, they] were standing around talking."[35]

Welch held a different opinion of plaintiffs' work performance, and asserted that talking with each other was a necessary part of their job:

> Q.    Did you ever have any problem with Mary Carter or Shirley Gilstrap getting their work done?
>
> A.    No.
>
> Q.    Did they have to talk to do their job?
>
> A.    Occasionally, yes.
>
> Q.    To make sure that they didn't clean the same area of the store twice?
>
> A.    Exactly.
>
> Q.    Did anyone else besides Tim Miller complain to you about their talking?
> ...
> A.    No.[36]

On the date of plaintiffs' termination, the Huntsville Castner-Knott janitorial crew consisted of about eighteen people, including approximately thirteen black employees and five white employees.[37]  Following plaintiffs' termination, both sought unemployment compensation and, after an initial denial, both were awarded benefits by the Alabama Department of Industrial Relations.[38]

---

[35] *Id.* (emphasis supplied).

[36] Plaintiffs' evidentiary submissions, Tab 8 (Welch deposition), at 21.

[37] *Id.*, Tab 3 (June 25, 1998 letter to EEOC), at unnumbered page 1 (relying on the February 28, 1998 payroll period).

[38] *Id.*, Tabs 3 and 4 (Decisions on Unemployment Compensation Claim).

14

The reports of plaintiffs' unemployment compensation claim hearing describe their last day as MCC employees. As to Carter, the report states:

> On December 30, 1997, the supervisor received a page from the store manager informing her that the claimant and a coworker were standing around, talking, and not doing their work. The supervisor went to the claimant and the coworker and informed them not to stand around and to do their work. The coworker had gone to the claimant, who is the assistant, to ask if she needed help. The claimant had begun her work upstairs that day and the coworker came to ask about helping. They were discussing where the claimant had started and stopped her work. Their discussion lasted a few minutes before they returned to work. After the supervisor spoke with the claimant and the coworker, the store manager contacted the employer with his complaint. The supervisor was then instructed to terminate both employees.[39]

Similarly, Gilstrap's report states:

> On her last day of employment, the employees were working shorthanded. Each employee is assigned a section of the store to clean. The claimant was normally assigned the boys department but also worked upstairs in accessories, shoes and handbags. The claimant completed her work in the boys department and went upstairs to ask a coworker what she had finished as the claimant was planning to help her with some of the work. Normally the employees would go to the manager or this coworker, who was also the assistant, to ask if there was other work to be done. They were discussing that the coworker would take one side of the store and the claimant would take the other side to complete the job. Their discussion lasted a few minutes. The manager spoke with the two employees about the complaint. The employer received a complaint from the store manager that the claimant and the coworker were standing around talking for approximately 30 minutes on that date. The employer instructed the manager to terminate both employees.[40]

Plaintiffs filed suit in this court on November 24, 1999, alleging that they had been subjected to discrimination on the basis of their race in violation of Title VII of the Civil Rights Act of 1964.

## III. DISCUSSION

To prevail on a Title VII employment discrimination claim, a plaintiff must prove that the employer intended to discriminate against her on the basis of her "race, color, religion, sex, or

---

[39] *Id.*, Tab 4 (Decision on Unemployment Compensation Claim), at 1.

[40] *Id.*, Tab 3 (Decision on Unemployment Compensation Claim), at 1.

national origin." 42 U.S.C. § 2000e–2(a)(1).

> The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens. ... As noted in *Griggs*, ...
>
>> "Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualification. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-31, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)) (other citations omitted); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 239, 109 S.Ct. 1775, 1784-85, 104 L.Ed.2d 268 (1989) ("Title VII eliminates certain bases for distinguishing among employees while otherwise preserving employers' freedom of choice.") (plurality opinion); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981) (observing that Title VII "does not demand that an employer give preferential treatment to minorities or women," and, that it "was not intended to diminish traditional management prerogatives") (citations and internal quotation marks omitted).

Three forms of proof may be used to establish an employer's intent to discriminate: (1) statistical evidence of a pattern of discrimination;[41] (2) direct evidence of a discriminatory animus;[42]

---

[41] *See, e.g., Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).

[42] *See, e.g., Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989). Only the most blatant remarks indicating a discriminatory animus constitute direct evidence. *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999); *Wright v. Southland Corporation*, 187 F.3d 1287, 1293-1303 (11th Cir.

or (3) circumstantial evidence. The evaluation of the sufficiency of a plaintiff's proof of the employer's intent differs, depending upon which form is used. Regardless of the form employed, however, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093.

Here, plaintiffs have not offered either statistical or direct evidence indicating that defendants intended to discriminate against them on the basis of race. Accordingly, the court must evaluate the sufficiency of plaintiffs' circumstantial evidence under the familiar analytical framework originally articulated by the Supreme Court in *McDonnell Douglas Corporation v. Green, supra*. The tripartite *McDonnell Douglas* burden-shifting scheme is designed to "bring the litigants and the court expeditiously and fairly to the ultimate question": whether defendants demoted and terminated plaintiffs because of their race. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093-94.[43]

---

1999). Further, "[t]o amount to direct evidence, a statement must: (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).

[43] The "ultimate question" in every employment discrimination case is *not* whether a contested employment action was good or bad, fair or unfair, or whether the plaintiff has established a prima facie case, or demonstrated pretext, but instead is whether "'the defendant intentionally discriminated against the plaintiff.'" *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983) (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093).

> We have repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision. *See Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984).

*Damon*, 196 F.3d at 1361.

A.     **Plaintiffs' Prima Facie Case**

Plaintiffs bear the initial burden of establishing a prima facie case of discrimination.[44]  That

burden is somewhat complicated in the context of the facts of this case, because plaintiffs were first

demoted, and then subsequently terminated by defendants.  Defendants allege that these employment

actions were taken in response to plaintiffs' on-the-job misconduct, but plaintiffs assert that the

motivating factor behind the demotions and terminations was their race.   Nevertheless, the

*McDonnell Douglas* prima facie case was "never intended to be rigid, mechanized, or ritualistic.

Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience,"

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957

(1978), as such evidence bears upon the "sensitive and difficult" issue of determining "the

employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S.

711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

Viewed in that light, this court concludes that the prima facie case applicable to a controversy

---

[44] The presentation of a prima facie case "serves an important function" en route to the resolution of ultimate issue in every employment discrimination case: "it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 253-54, 101 S.Ct. at 1094.  Having eliminated the most common non-discriminatory reasons for the contested employment action, a prima facie case thus creates a *rebuttable* presumption that the employer intentionally discriminated against the plaintiff,

> because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. ... And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting. Thus, when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race.

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949-50, 57 L.Ed.2d 957 (1978) (citation omitted); *see also, e.g., St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Burdine*, 450 U.S. at 254 n.7, 101 S.Ct. at 1094 n.7 (explaining that, as used in the context of the *McDonnell Douglas* analytical framework, the phrase "prima facie case" "denote[s] the establishment of a legally mandatory, rebuttable presumption"); *Walker v. Mortham*, 158 F.3d 1177 (11th Cir. 1998).

in which a plaintiff initially was demoted and ultimately discharged, allegedly for work-related misconduct, has four elements. Each plaintiff must demonstrate: *first*, that she is a member of a protected class; *second*, that she was subjected to adverse employment actions; *third*, that she was qualified to perform the duties of the job positions from which she was first demoted, and then, subsequently, discharged; and, *finally*, disparate treatment — that is, she was *either* (*a*) replaced in each position by persons outside her protected class, *or* (*b*) that similarly situated employees who were not members of plaintiff's protected class engaged in nearly identical conduct, but were neither demoted nor discharged. *See, e.g., Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998);[45] *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th

---

[45] The Eleventh Circuit's holding in *Jones v. Bessemer Carraway Medical Center* is founded in part on its prior opinion in *Jones v. Gerwens*, 874 F.2d 1534 (11th Cir. 1989). In *Gerwens*, a black police officer was suspended for unauthorized use of a police vehicle, while white police officers who allegedly had committed similar offenses received less stringent discipline, or no discipline at all. The *Gerwens* Court explained that:

> [I]n cases involving alleged racial bias in the application of discipline for violation of work rules, the plaintiff, in addition to being a member of a protected class, must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct.

*Id.* at 1540.

The *Gerwen* holding was questioned in *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, *superseded in part on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998). In *Bessemer Carraway*, a black licensed practical nurse was discharged for violation of work-rules (*i.e.*, failing to wear required uniform to work, and failing to follow a supervisor's instructions), while white employees allegedly were treated more favorably despite similar conduct. The Eleventh Circuit wrote:

> Considering the facts in *Jones*, our impression is that words about "did not violate the work rule" are unnecessary to the decision in *Jones* and are dicta; but we will discuss them. The pertinent words in *Jones* demand not two, but three elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff has engaged — either (a) disputedly or (b) admittedly — in misconduct similar to persons outside the protected class; and (3) that similarly situated, nonminority employees (that is, persons outside the protected class) received more favorable treatment.

> We stress that, under the *Jones* formulation, no plaintiff can make out a prima facie case by showing just that she belongs to a protected class and that she did not violate her employer's work rule. The plaintiff must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better.

Cir. 1984);[46] *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000);[47]

*Lathem v. Dep't of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999);[48] *Holifield v.*

---

151 F.3d at 1311 n.6.

[46] The black plaintiff in *Nix* was fired from his job as a disc jockey for violating a company policy prohibiting moon-lighting at competing radio stations. 738 F.2d at 1183. The court held that:

> A prima facie case of discriminatory discharge may be established in different ways. One way is the method recognized by WLCY: a member of a protected class makes out a prima facie case if he establishes that he was qualified for the job, but was fired and replaced by one outside the protected class. ... But we have also held that a plaintiff establishes a prima facie case by showing that he was suspended or fired while others not in the plaintiff's protected class, "having comparable or lesser qualifications," were retained. ...
>
> Nix relies on a third version of the prima facie case, based on differential application of work or disciplinary rules. ... We have consistently held that a plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows that he is a member of a protected class, that he was qualified for the job from which he was fired, and "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained." ... The prima facie case is established even if the plaintiff's replacement is also a member of the protected class. ... "The principal focus of [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole." ...
>
> Title VII does not "give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." ... Nor does Title VII allow an employer to escape liability for discriminatorily discharging an individual by maintaining an overall balance in the work force. ...

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185-86 (11th Cir. 1984) (citations and footnote omitted) (bracketed alterations in original).

[47] In *Alexander*, a case in which eighteen white current and former employees of the Fulton County, Georgia Sheriff's Department asserted race discrimination claims in violation of Title VII and 42 U.S.C. §§ 1981, 1983, the Eleventh Circuit considered the claims of those plaintiffs who contended they had been disciplined more severely than were black officers who committed similar offenses, and held:

> To establish discrimination in discipline, just like showing discrimination in hiring, a plaintiff must first make out a prima facie case demonstrating: 1) that he belongs to a protected class under Title VII; 2) that he was qualified for the job; and 3) that a similarly situated employee engaged in the same or similar misconduct but did not receive similar discipline.

*Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000) (citing *Lathem v. Dep't of Children and Youth Services*, 172 F.3d 786, 792 (11th Cir. 1999); *Holifield*, 115 F.3d at 1562).

[48] In *Lathem*, a white female juvenile court intake officer was first suspended with pay, but later terminated for misconduct (*i.e.*, for becoming "personally involved" with a juvenile client, and then lying about the relationship when questioned by supervisors), while her supervisor — a male employee who plaintiff contended had committed more egregious violations of the Department's anti-fraternization rule — was not terminated. 172 F.3d at 789-90. The court held that

> Title VII plaintiffs establish a *prima facie* case when they demonstrate: (1) that the plaintiff belongs

*Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997);[49] *Davis v. Qualico Miscellaneous Inc.*, 161 F. Supp.

2d 1314, 1319 (M.D. Ala. 2001).[50]

The first two elements are not disputed: both Carter and Gilstrap are black, and both were

subjected to adverse, "tangible employment actions."[51]

Defendants assert that plaintiffs cannot establish they were "qualified," because repeated

complaints about the quality of their work were levied against each of them by the client's store

---

to a class protected under Title VII; (2) that the plaintiff was qualified for the job; (3) that the misconduct for which the employer discharged the plaintiff was the same or similar to what a similarly situated employee engaged in, but that the employer did not discipline the other employee similarly.

*Lathem*, 172 F.3d at 792 (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)).

[49] In *Holifield*, a black physician initially was demoted from his position as Chief of Health Programs at a Florida state penitentiary to the status of staff physician, and later discharged, for misconduct (*e.g.*, unacceptable professional behavior). He argued that similarly situated white physicians were not subjected to similar discipline. The district court, in an opinion adopted by the Eleventh Circuit, 115 F.3d at 1556-57, held that a Title VII plaintiff establishes a prima facie case of race discrimination "by showing: (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his [protected] classification more favorably; and (4) he was qualified to do the job." *Holifield*, 115 F.3d at 1562 (citations omitted).

[50] In *Davis*, the Middle District of Alabama considered the claim of an African-American male welder who was initially suspended and later terminated for repeated violations of the employer's attendance policies. The district court held that:

A plaintiff's prima-facie case for a discharge-discrimination claim must show the following elements: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position at issue; (3) the plaintiff was discharged despite his qualification; and (4) the plaintiff was subject to differential treatment, that is, he was either (a) replaced by someone who was not a member of the plaintiff's protected class or (b) a similarly situated employee who was not a member of the protected class engaged in nearly identical conduct and was not discharged.

*Davis*, 161 F. Supp. 2d at 1319 (citing *Nix*, 738 F.2d at 1185) (Thompson, J.).

[51] An adverse, "tangible employment action" is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," or "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 2268-69, 141 L.Ed.2d 633 (1998) (citation and internal quotation marks omitted); *see also Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) ("An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.").

manager.[52] Defendants also argue that plaintiffs offer in rebuttal of those assertions only insufficient, "self-serving contradictory evidence" that "they were performing their jobs."[53]

Defendants' argument is somewhat unusual. Without question, defendants' decision to terminate plaintiffs' employment is the gravamen of this controversy.[54]  In termination cases, however — as contrasted with cases involving an employer's failure to hire or promote — the question of a plaintiff's qualification to perform the duties of her job is not often an issue. *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  Even so, defendants appear to direct their "not qualified" argument solely to the matter of plaintiffs' discharge.[55]  Nevertheless, it cannot be overlooked that plaintiffs have complained that *both* their demotion *and* discharge were products of unlawful race discrimination.[56]  Thus, this court considers whether plaintiffs were qualified to perform their MCC janitorial duties at the time of their demotion *and* at the time of their discharge. In doing so, this court follows the rationale of the Eleventh Circuit, which has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987).  It is further persuasive that plaintiffs have tendered the report of a vocational expert opining that each was qualified to perform the duties of the positions from which she was, first, demoted and, subsequently, terminated.  That witness characterized Carter, for example, as possessing the "qualifications to perform the job of

---

[52] Defendants' Brief in Support of Summary Judgment at 16-17.

[53] *Id.*

[54] This is due to the fact that plaintiffs' damage award is potentially much larger in the event of a jury finding that defendants' discriminatorily discharged plaintiffs, than in the case of a jury finding that plaintiffs were properly discharged, but were demoted on the basis of impermissible considerations of race.

[55] *See* Motion for Summary Judgment at 17.

[56] Amended Plaintiffs' Response in Opposition at 16.

22

Supervisor of a janitorial crew. She has many years' experience in the janitorial field with satisfactory performance, as evidenced by her earnings and stable employment record."[57] The same witness assessed Gilstrap as "qualified for the job of Assistant Supervisor of a janitorial crew. She has worked a number of years in Housecleaning and Custodial Services. She appears to have a strong work ethic."[58]

Accordingly, this court construes defendants' argument that plaintiffs were not qualified as going more to the credibility of the stated reasons for defendants' adverse employment actions, and, as so interpreted, shall discuss it in greater detail below. *See Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) ("[A]llegations of poor performance against plaintiffs discharged from long-held positions may be properly considered ... when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination.").

Plaintiffs' prima facie cases begin to weaken in their demonstration of disparate treatment: that is, *either (a)* plaintiffs were replaced by persons outside their protected class, *or (b)* similarly situated white employees who engaged in nearly identical conduct were not demoted or discharged. Because plaintiffs contend that they were subjected to impermissible race discrimination *both* in the matter of their demotions *and* terminations, each plaintiff must satisfy the fourth element of a prima facie case as to each adverse employment action.

1.    **Plaintiffs' demotions**

     a.    **Replacement by persons outside plaintiffs' protected class**

Beginning with Carter's demotion, it is immediately apparent that Carter has satisfied the

---

[57] Plaintiffs' evidentiary submission, Tab 5 (Carter vocational report), at 3.

[58] *Id.* (Gilstrap vocational report), at 2.

fourth element of a prima facie case.  MCC replaced her in the "account manager" supervisory position with a white female, Patricia Congo.[59]

Gilstrap, however, cannot demonstrate that a white employee replaced her in the "assistant account manager" supervisory position.  Even though plaintiffs have *argued* that both Carter and Gilstrap were replaced by the same white employee, Patricia Congo,[60] Gilstrap in fact was replaced by another black employee, Carla King, who was elevated from the janitorial crew.[61]  Thus, as to her, it is necessary to address the alternative prong of the fourth element of a prima facie case.

> **b.    Gilstrap's demotion:   disparate treatment of similarly situated employees outside protected class**

Gilstrap asserts in a conclusory fashion that similarly situated white employees engaged in nearly identical conduct — taking unauthorized breaks and talking to other employees — but were not similarly disciplined:

> Richard Willis[[62]] did not discipline similarly situated white employees, such as Elizabeth Welch[[63]] and Patricia Congo, in such a fashion.  Richard Willis replaced us with a white employee without good cause, despite our excellent work record.[64]

However, Gilstrap does not document the date(s) and character of the conduct attributed to Welch and Congo that failed to culminate in either employee's demotion.

Gilstrap also alleges that John Stanley — who was not an employee of defendants, but the store manager of MCC's client, Castner-Knott — treated both plaintiffs less favorably than white

---

[59] *Id.*, Tab 4 (June 25, 1998 Letter to EEOC), at 2.

[60] Amended Plaintiffs Response in Opposition at 16.

[61] *See supra* note 29 and accompanying text.

[62] Richard Willis was MCC's regional manager and vice-president on the dates relevant to this action.

[63] Elizabeth Welch, plaintiffs' former supervisor and the MCC employee who recommended their promotion in July of 1997, now is married to Richard Willis.

[64] *Id.*, Tab 2 (Gilstrap affidavit), at 1-2.

employees because they were black.  Gilstrap testified that Stanley refused to interact with them:

> Q.   Tell me what it was that you think was racially discriminatory about the way you were treated.
>
> A.   The fact that when there was something needed to be done in the store, *[Stanley] would not come to us directly to say, this needs you all's attention, or something in that manner*.  He would have to call Richard Willis, and in return Richard would call us to say, [Stanley] wants this done or John needs that done.  And on the other hand, *when we were demoted and Patricia Congo became supervisor, he was in direct contact with her*.[65]

Gilstrap contends that Stanley's failure to approach plaintiffs directly about their work amounted to race-based discrimination.[66]  As further evidence of this fact, plaintiffs point to Stanley's facial expression upon first meeting them.  Carter testified as follows:

> Q.   Are you contending in this lawsuit that you were discriminated against on the basis of race?
>
> A.   Yes.
>
> Q.   Why?
>
> A.   The treatment — the expression that John Stanley had on his face when he first met me ....[67]

Carter elaborated, saying that Stanley "just had an expression on his face, a funny expression on his face.  And [Stanley] just said it was nice to meet you, and then him and Richard Willis started talking."[68]  When asked what she believed the expression on Stanley's face meant, Carter conjectured that he was "[s]urprised," and that the only reason she could surmise for his surprise was her and Gilstrap's "color."[69]

---

[65] *Id.*, Tab 11 (Gilstrap deposition), at 24 (emphasis supplied).

[66] *Id.* at 23-24.

[67] *Id.*, Tab 10 (Carter deposition), at 46.

[68] *Id.* at 20.

[69] *Id.*

25

Such testimony misses the point, however.  It does not establish that any similarly situated white employees engaged in conduct nearly identical to that for which Gilstrap was disciplined, but were not demoted.  In fact, a review of all of the evidence and documents submitted to the court failed to evince *any* specific instance in which similarly situated white employees were not disciplined like Gilstrap and Carter for standing around, talking, taking unauthorized breaks, or in response to a client complaint about the white employee's conduct.  Again, "[m]ere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp.*, 43 F.3d at 592 (citation omitted).  Gilstrap must offer this court specific facts that are "material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicious." *American Lease Plans*, 637 F.2d at 315.

Gilstrap does offer MCC regional manager and vice-president Richard Willis's deposition testimony to suggest that Castner-Knott's store manager also complained about white MCC employees, but that similar adverse employment actions were not taken in response:

Q.    Did John Stanley make any complaints about Patricia Congo?

A.    Probably.

Q.    Why do you say "probably"?

A.    He was tough.

Q.    How did Patricia Congo leave the employment as an account manager?

...

A.    I don't know, I would not be familiar with that.[70]

---

[70] Plaintiffs' evidentiary submission, Tab 9 (Willis deposition), at 23.

However, nothing contained within this meager showing demonstrates that similarly situated white employees, like Patricia Congo, engaged in nearly identical conduct and were not demoted. Gilstrap's assertion, then, that defendants failed to discipline similarly situated white employees is nothing more than a personal opinion or conclusory allegation. "Personal opinions and conclusory allegations, in the absence of supporting evidence, are insufficient to withstand summary judgment." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1365 (M.D. Fla. 2001) (citing *Holifield*, 115 F.3d at 1564 & n.6; *Earley v. Champion International Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990)). While this court is obligated to resolve inferences from the evidence presented to it in favor of Gilstrap, the party opposing summary judgment, *see Spence*, 873 F.2d at 256, "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels*, 692 F.2d at 1324.

As a result, this court's analysis of Gilstrap's claim that she was demoted on the basis of unlawful race discrimination ends here, with the finding that Gilstrap has failed to make a prima facie showing under Title VII.[71]

### 2.    Plaintiffs' terminations

#### a.    Replacement by persons outside protected class

Plaintiffs have failed to demonstrate that, following their terminations, each was replaced by a person outside her protected class. Nothing in the documents submitted by plaintiffs evidences this fact. Plaintiffs assert in their brief, but without evidentiary support, that "[a]fter their

---

[71] Even if this court permitted Gilstrap the inference that she was treated less favorably than similarly situated employees, both plaintiffs' claims ultimately fail for failure to substantiate that defendants' reasons for the adverse employment actions at issue here are merely pretextual. *See infra* Parts B and C.

termination, Carter and Gilstrap were replaced by a white female."[72]   In fact, as the foregoing

discussion makes clear, *Carter* was replaced by a *white female* following her *demotion* to assistant

account manager, and *Gilstrap* was replaced by a *black female* following her *demotion* from assistant

account manager to janitorial crew member.  Plaintiffs have not identified the person or persons, if

any, who replaced either of them in the janitorial staff positions following their *terminations*.

**b.    Disparate treatment of similarly situated employees outside protected class**

Plaintiffs also have failed to demonstrate that similarly situated white employees engaged

in conduct nearly identical to that for which plaintiffs were discharged, but were not terminated.

This conclusion is founded in the same rationale as the court's finding on Gilstrap's demotion

claim.[73]  This is because plaintiffs have neglected to put forth *any* corroboration for their assertion

that

> Richard Willis terminated us for a [sic] no good cause.  Richard Willis did not
> discipline similarly situated white employees, such as Elizabeth Welch and Patricia
> Congo, in such a fashion.  Richard Willis replaced us with a white employee without
> good cause, despite our excellent work record.[74]

Plaintiffs have not substantiated these allegations with facts to document the date(s) and character

of the conduct attributed to these white employees, or to evidence the fact that neither white

employee was terminated as a result of that conduct.

Further, while plaintiffs complain that John Stanley — store manager of MCC's client,

Castner-Knott — treated both plaintiffs less favorably than white employees because they were

black, plaintiffs offer nothing more than Stanley's failure to approach plaintiffs directly about their

---

[72] Amended Plaintiffs' Response in Opposition at 3.

[73] *See supra* text accompanying notes 62-71.

[74] Plaintiffs' evidentiary submission, Tabs 1 and 2 (Carter and Gilstrap affidavits), at 1-2.

janitorial work,[75] and supposition about the race-based motivations for Stanley's facial expression upon first meeting plaintiffs.[76]  While plaintiffs do offer Richard Willis's deposition testimony to suggest that Castner-Knott's store manager also complained about white MCC employees, and that similar adverse employment actions were not taken in response,[77] this testimony does not sufficiently demonstrate that similarly situated white employees, like Patricia Congo, engaged in nearly identical conduct, but were not terminated.

As with Gilstrap's demotion claim, this court has been unable to find any reference in the body of evidence submitted that suggests similarly situated white employees were standing around, talking, taking unauthorized breaks, or were complained about by MCC clients, and were not similarly disciplined.  In fact, the only specific discussion of MCC's discipline of similarly situated white employees came from MCC's president, James L. Bramble, who testified in deposition that he knew of at least two white male MCC employees, both in supervisory positions, who had been terminated from their positions due to "failure to perform" or "client complaints."[78]

In the absence of "detailed and precise facts," plaintiffs cannot avoid "the award of summary judgment."  *Resolution Trust Corp.*, 43 F.3d at 592 (citation omitted).  Ultimately, plaintiffs' assertion that defendants failed to terminate similarly situated white employees is nothing more than a personal opinion or conclusory allegation and, as such, is "insufficient to withstand summary judgment."  *Chambers*, 132 F. Supp. 2d at 1365 (citing *Holifield*, 115 F.3d at 1564 & n.6; *Earley*, 907 F.2d at 1082).

---

[75] *See supra* text accompanying notes 65-66.

[76] *See supra* text accompanying notes 67-69.

[77] *See supra* text accompanying note 70.

[78] Plaintiffs' evidentiary submission, Tab 7 (Bramble deposition), at 72-73.

29

Once the dust from these findings settles, then, it is clear that this court can proceed with the *McDonnell Douglas* analysis only as to Carter, and the matter of Carter's *demotion* from account manager to assistant account manager during her employ with MCC.

**B.      Defendants' Nondiscriminatory Reasons for Carter's Demotion**

Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. Here, defendants assert that Carter was demoted (and ultimately terminated) for taking unauthorized breaks, during which, according to client complaints, she was observed talking to other MCC janitorial employees for extended periods — thus adversely affecting the other employees' work performance as well. While Carter may not agree that her conduct warranted such discipline, Carter does not dispute that defendants told her that she was demoted (and ultimately terminated) for such reasons.[79]

As a threshold matter, there is a dispute as to whether Carter was given written warnings about her conduct:  written warnings given to both plaintiffs are unsigned and, thus, an inference might be drawn that neither plaintiff was aware of these *written* reprimands.  Both plaintiffs in fact appear to argue that they did not have notice of complaints about their alleged unauthorized breaks when they assert that "defendants have papered the plaintiffs' files with two warning slips each for

---

[79] *See, e.g.,* Plaintiffs' evidentiary submission, Tabs 1 and 2 (Affidavits of Carter and Gilstrap) (discussing complaints about the quality of their work). As Carter admitted in her deposition:

> Q.      The reason you were given for your termination was that you were standing around and not working; is that correct?
>
> A.      Yes.

*Id.*, Tab 10 (Carter deposition), at 63.

Carter and Gilstrap....  The defendants have not offered any evidence indicating that the warning slips were shown to the plaintiffs prior to the unemployment compensation hearing following their termination."[80]  Testimony elicited from Willis suggests otherwise, although it does not nail the issue:

> Q.    Do you recall the warning notices that [MCC] used for employees for their discipline?
>
> A.    Yes.
>
> Q.    Was it customary to have an employee sign those forms?
>
> A.    We would ask them to, but they sometimes chose not to.
>
> Q.    So those forms would at least be shown to an employee if they were used?
>
> A.    If they were used more than likely, yes.[81]

The testimony of MCC President James L. Bramble is of a similar, inconclusive tenor:

> Q.    As far as the discipline of personnel [goes], is that something that's pretty much the same company wide, as far as the procedure for writing up an employee, warning them?
>
> A.    Well, we have a policy for writing up employees.  Yes.  And it is a company-wide policy.
>
> Q.    What is that policy?
>
> A.    We have a slip that we use for a variety [of] reasons when an employee doesn't perform in a satisfactory manner or has attendance problems.  Is it employed equally by every manager?  I don't — I don't believe so.
>
> ...
>
> Q.    And what is the procedure involving the signature line?

---

[80] Amended Plaintiffs' Response in Opposition at 4.

[81] Plaintiffs' evidentiary submission, Tab 9 (Willis deposition), at 29-30.

31

A.      The employee is supposed to sign the slip when it's presented to them or
        when they're counseled, but some of our supervisors use it for verbal
        warnings, where they document a verbal warning on a slip. Then you get no
        employee signature.[82]

Despite this testimony, this court's obligation is to construe the evidence in the light most

favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See,*

*e.g., Spence*, 873 F.2d at 256. Therefore, the court must assume that neither plaintiff was shown the

written reprimands placed in her personnel file during November and December of 1997.

Nevertheless, other evidence substantiates defendants' assertion that Carter was demoted (and

ultimately terminated) as a result of client complaints. *See Rice-Lamar*, 232 F.3d at 843 (finding

legitimate nondiscriminatory reasons for adverse employment action where it was undisputed that

plaintiff was disciplined for failing to follow her supervisors' instructions).

For example, before Welch's departure — sometime "prior to July of '97,"[83] and at least four

months prior to the first written reprimand in plaintiffs' employment files — Welch told both

plaintiffs that the client, Castner-Knott, had complained about their unauthorized breaks.

Q.      Had [Tim Miller, Castner-Knott's head of security] ever had a problem
        specifically with Mary Carter or Shirley Gilstrap?

        ...

A.      Yes.

Q.      And what was that problem?

A.      Oh, *he had come to me one time saying* that he had been walking the store,
        of course, and *they were doing a lot of talking instead of working*.

---

[82] *Id.*, Tab 7 (Bramble deposition), at 40-41.

[83] Plaintiffs' evidentiary submission, Tab 8 (Welch deposition), at 33. Welch could not remember, and neither
party has evidenced, the exact date of her departure from MCC.

32

...

Q.      How did you respond to his complaints?

...

A.      *I responded by going to [plaintiffs] and telling them that [Miller] was coming to me complaining about them and, you know, they needed to be aware of that, that he was watching them. ...*

...

Q.      *Was it Tim Miller's job to supervise the cleaning people?*

A.      *In the beginning, when I first became an account manager, yes.*[84]

Further, MCC's regional manager and vice-president Richard Willis stated that he had to spend extra time training Carter in her supervisory role, because "the store cleanliness quality ... was getting worse the more [Carter] was supervising."[85]  Although Willis could not recall the specific reasons for plaintiffs' termination during deposition, he confirmed that the client had lodged complaints: "I just remember that the security guy complained about their work habits who in turn talked with the operations manager John Stanley who advised me about it."[86]  Willis added, however, that the decision to demote Carter was "probably" his decision, and that it had been based on the "cleanliness of the store and complaints from the store personnel."[87]  Willis also wrote about the events leading to Carter's termination in a handwritten letter to Ronald Grawemeyer, another MCC administrator.  He explained to Grawemeyer that he worked with Carter during her transition from assistant account manager to account manager following Welch's departure, because "the store

---

[84] *Id.* at 22 (emphasis supplied).

[85] *Id.*, Tab 9 (Willis deposition), Ex. 1 (April 29, 1998 letter to Ron Grawemeyer).

[86] *Id.*, Tab 9 (Willis deposition), at 14.

[87] *Id.* at 19-20.

cleanliness quality ... was getting worse the more time [Carter] was supervising."[88]

        In addition, soon after Stanley became Castner-Knott's store manager, he requested special cleaning of his office while he was away on vacation.  According to Willis:

> [W]hen Mr. Stanley got back most of the details and his office carpet were not done.
>
> *I wrote [Carter] up for poor performance and soon after demoted her back to the assistant account manager*.  After this Mary did as little work as possible and was resentful of the new account manager I put in there.
>
> The security manager (Tim) complained as did John Stanley about Mary Carter and Shirley Gilstrap not working, just walking around talking wasting the client's money and MCC's.  I had Pat Congo write them both up and finally had her let them go for not working *after still more complaints from the client John Stanley*.[89]

Willis also explained that he was personally critical of the quality of Carter's work:

> Q.    Did you ever have any problems personally with Mary Carter's work performance?
>
> A.    Yes, toward the end of her job with us, yes.
>
> ...
>
> Q.    Was that based upon your own observations that the store was dirty?
>
> A.    Yes.
>
> Q.    Did you ever discuss that with Mary to try to correct her?
>
> A.    Yes.  In fact, I remember one time I gave her a list of things to do and a time frame to do it in.  And I came back, and they were not done.
>
> ...
>
> Q.    Was there any other instance that you can remember regarding her performance that would have been a bad performance on her part?

---

[88] *Id.*, Tab 9 (Willis deposition), Ex. 1 (April 29, 1998 letter to Ron Grawemeyer).

[89] *Id.* (emphasis supplied).

34

A.      I don't remember specific amounts of times that I went over there, but there
        was more that one time that there were a lot of deficiencies, and we gave her
        a list of things to do trying to help her, and they weren't completed for
        whatever reason.[90]

Defendants have emphasized that client satisfaction was a key factor in MCC retaining an

account. Thus, when Stanley, the manager of the client's store, complained repeatedly about

plaintiffs' performance, defendants had to consider that

> [MCC]'s cleaning contract with Castner-Knott is a month-to-month arrangement,
> terminable on 30 days' notice. As a result, *customer satisfaction is of paramount
> importance; and the Company cannot afford to jeopardize its business (and the
> employment of the entire work crew) by retaining an employee whose work
> performance is unsatisfactory and who has been the object of complaints from the
> Castner-Knott store manager.*[91]

That Castner-Knott might terminate its contract was apparently a real possibility, further

substantiating defendants' decision to discipline Carter. According to Bramble:

Q.      Because of John Stanley's complaints, did Richard Willis ever express to you
        a concern that he may not be able to retain that account?

A.      Yes, he did.

Q.      Was Richard Willis going out of his way to try to please John Stanley?

A.      I believe that he was trying to keep the store[] clean like he was supposed to.

Q.      Did Richard Willis ever express to you that John Stanley did not want to have
        a black on-site account manager?

A.      No.[92]

This court thus finds that defendants have stated a legitimate, nondiscriminatory reason for

the adverse employment action taken against Carter: appeasement of an unhappy client. Thus, "the

---

[90] *Id.* at 34-36.

[91] *Id.*, Tab 3 (June 25, 1998 letter to EEOC), at 2 (emphasis supplied).

[92] *Id.*, Tab 7 (Bramble deposition), at 39-40.

presumption raised by the prima facie case is rebutted." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 12 L.Ed.2d 407 (1993). "The defendant's 'production' ... having been made," *Id.* at 511, 113 S.Ct. at 2749, "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1095.

## C.    Carter's Proof of Pretext

At this third level of analysis, a plaintiff must be afforded the opportunity to discredit the employer's proffered explanation for the contested employment action, and to show that the stated reason is but a pretext for discrimination on the basis of plaintiff's race. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). This is because the plaintiff in an employment discrimination suit shoulders the ultimate burden of proving that the defendant unlawfully discriminated against her. *See, e.g., Hicks*, 509 U.S. at 508, 113 S.Ct. at 2747-48; *Wright v. Southland Corporation*, 187 F.3d 1287, 1292 (11th Cir. 1999) ("In sum, the plaintiff in an employment discrimination lawsuit always has the burden of demonstrating that, more probably than not, the employer took an adverse employment action against him on the basis of a protected personal characteristic.").

Thus, Carter must now demonstrate, "through presentation of [her] own case ... that the proffered reason was not the true reason for the employment decision ... and that race was." *Hicks*, 509 U.S. at 508, 113 S.Ct. at 2747 (citations and emphasis omitted); *see also Combs*, 106 F.3d at 1538 (noting that a plaintiff must put on enough evidence to permit a jury to reasonably "conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct'") (quoting *Cooper-Houston v. Southern Railway Company*, 37 F.3d 603, 605 (11th Cir. 1994)). A "reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason

36

was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515, 113 S.Ct. at 2752. Carter can meet this burden by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. duPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (quotations omitted)).

Defendants argue that Carter has failed to meet her burden, in that Carter's conclusory statements that her performance at the Castner-Knott store was adequate are not sufficient to overcome the legitimacy of the reasons offered for Carter's demotion.[93]  Carter offers as evidence of defendants' discriminatory motives, and thus the pretextual nature of the reasons offered for the adverse employment action taken against her, that "there is no evidence that the store ever fell below an acceptable level of cleanliness," and that "defendants have offered no evidence that Mary Carter ever failed a cleaning inspection."[94]  This argument misses the mark, as the reason offered for Carter's demotion are not that the store "fell below an acceptable level of cleanliness," or that Carter failed a cleaning inspection, but rather that her conduct caused the client, Castner-Knott, to complain about MCC's performance under the contract.

Carter does point out in rebuttal, however, that her former supervisor, Welch, was pleased with Carter's performance;[95] that Carter was treated differently than other white personnel, as she was kept on an hourly wage, and not awarded salaried compensation like other white supervisors;[96]

---

[93] Motion for Summary Judgment at 18.

[94] Amended Plaintiffs' Response in Opposition at 18.

[95] *Id.* at 17.

[96] *Id.*

that Castner-Knott's head of security Tim Miller was "very prejudiced" and "harassed the black cleaning personnel";[97] along with the administrative finding by the Alabama Department of Industrial Relations that Carter was entitled to unemployment compensation.[98]

Considering these contentions in turn, this court is not significantly persuaded by the fact that Welch — Carter's former supervisor and predecessor in the position from which Carter was ultimately demoted — was pleased with Carter's performance. Carter offers no specific rebuttal to the fact, demonstrated by defendants, that Carter's conduct elicited complaints from the client, Castner-Knott, and that it was due to those client complaints that Carter was demoted and ultimately terminated. Such complaints were levied against Carter *both* during the time she was assistant supervisor under Welch, *and* following Welch's departure from MCC employ.[99] That Welch thought Carter was a good employee does not dispel the fact that *Welch herself*, along with other MCC supervisory employees, had to approach Carter to discuss client complaints about her conduct.

Further, while Carter has offered evidence that she was kept on an hourly pay rate, and not converted to a salaried employee, Carter has not demonstrated that it is "more probabl[e] than not" that this was due to race-based discrimination, rather than the reasons offered by defendants. *Wright*, 187 F.3d at 1292. In his deposition, Willis testified:

Q.     Were some account managers paid on a salary basis?

A.     Most of them were.

Q.     Was Patricia Congo paid on a salary basis?

A.     Yes.

---

[97] *Id.* at 18.

[98] Amended Plaintiffs' Response in Opposition at 20-21.

[99] *See supra* text accompanying notes 83-90.

38

Q.    Was Elizabeth [Welch] paid while she was account manager on a salary basis?

A.    Yes.

Q.    What about Mary Carter?

A.    I don't know.

Q.    Would that have been unusual for her not to be paid on a salary basis?

A.    No.  A lot of times when we started someone out in that position, we paid them — they could progress up if they did a good job.[100]

This explanation is neither implausible nor inconsistent considering, for example, that Congo (who replaced Carter following her demotion) was brought into the Huntsville Castner-Knott store after serving as an MCC account manager at a Castner-Knott store in Decatur, Alabama.[101] *See Combs*, 106 F.3d at 1538.  In contrast, Carter's account manager position in the Huntsville Castner-Knott store was her first, even though she had served in an assistant's role under Welch.[102]

Carter also makes much of the conduct and purported racist attitudes of Castner-Knott security employee Tim Miller, and of the racially discriminatory motives of Castner-Knott store manager John Stanley.[103]  These assertions become relevant, despite the fact that neither Miller nor Stanley were MCC employees, because the Eleventh Circuit has said that "[t]he biases of one who neither makes nor influences the challenged personnel decisions are not probative in an employment discrimination case." *Holifield*, 115 F.3d at 1563-64.  This court considers the opposite situation, and so must address the possibility that Stanley and/or Miller influenced Carter's employment status

---

[100] Plaintiffs' evidentiary submission, Tab 9 (Willis deposition), at 34.

[101] *Id.* at 19-20.

[102] *Id.*, Tab 1 (Carter affidavit), at unnumbered page 1.

[103] *See supra* text accompanying notes 23, 28, 65-69.

on the basis of racist bias, because it was the complaints by Miller to Stanley, and ultimately by

Stanley to MCC's regional manager and vice-president, Richard Willis, that led to Carter's

demotion.[104]  Despite this inferential possibility, this court nonetheless finds that Carter has not met

her burden of demonstrating that these complaints were pretext for Stanley and Miller's alleged

racist sentiments.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an

inference is not based on the evidence but is pure conjecture and speculation."  *Daniels*, 692 F.2d

at 1324.  Moreover, Carter has not offered evidence to demonstrate that defendants' proffered

reasons for her demotion — the Castner-Knott complaints — are fraught with "weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions."  *Combs*, 106 F.3d at 1538.  Carter

has not "persuade[d] the court that a discriminatory reason more likely motivated the employer" with

the evidence offered here.  *Rice-Lamar,* 232 F.3d at 843 (quoting *Burdine*, 450 U.S. at 255-56, 101

S.Ct. at 1094-95).  Instead, Carter has offered evidence that is at best colorable, *see Brown*, 848 F.2d

at 1537, conclusory, *see Peppers*, 887 F.2d at 1498, or conjectural, and does not create a genuine

issue of material fact.

For example, Carter offers evidence of Welch's "feeling" that Miller was racist.  Welch

testified, however, that she never heard Miller make racially derogatory or racist comments.  Welch

merely believed Miller to be racist, because "mainly he really harassed the cleaning people a lot.

And, like I said, 90 percent of them were black.  I just formed that opinion of him."[105]  Welch also

testified, however, that she also believed she had been harassed by Miller, because "[h]e was the type

of person that because he was over Security he thought he was upper management.  He would run

---

[104] *See supra* text accompanying notes 89-91.

[105] Plaintiffs' evidentiary submission, Tab 8 (Willis deposition), at 20.

to the manager of the store, anything and everything regarding cleaning.'"[106] Welch further explained that it was actually Miller's job to supervise the cleaning staff when she came on board as MCC's account manager.[107]   In light of this testimony, it is not clear to a probability that Miller's motivations were race-based.

Moreover, Carter's own testimony tends to refute her claim of Stanley's (and thus defendants') discriminatory animus.  For example:

> Q.      Did John Stanley ever make any racially discriminatory remarks to you?
>
> A.      No.[108]

Carter also admitted that there was substance to Stanley's complaints about the cleanliness of the store:

> Q.      And how did you learn that John Stanley had complained about the cleanliness of the store?
>
> A.      Through Richard Willis.
>
> ...
>
> Q.      Did you think that John Stanley was correct to be complaining about the carpet?
>
> A.      Well, the carpet — it was clean in some places and some places had bad spots.
>
> Q.      Was John Stanley more fussy or particular about how the store looked than the other Castner-Knott store managers before him?
>
> A.      No.[109]

---

[106] *Id.* at 18.

[107] *Id.* at 22-23.

[108] *Id.*, Tab 10 (Carter deposition), at 23.

[109] *Id.* at 43.

In response to statements in her termination report that she had been written up "for standing around talking, store manager wanted to get rid of; every time he saw her, she was standing around talking,"[110] Carter testified as follows:

Q.    Do you know whether John Stanley may have seen you standing around talking when you didn't see him?

A.    No.

Q.    *And if Mr. Stanley does not like having Management Cleaning Control employees standing around in his store talking, is that race discrimination?*

A.    *No.*[111]

Carter finally offers the Alabama Department of Industrial Relations administrative finding ("ADIR report") to demonstrate the pretextual nature of defendants' stated reason for her demotion, specifically that portion of the ADIR report stating that the "evidence does not support the allegation the claimant was not working but talking for an extended period of time."[112] Carter argues that the ADIR report should provide "substantial evidence rebutting the pretext offered by the defendants."[113]

Whether this court can consider the ADIR report as evidence of defendants' pretext, however, is a function of two inquiries:  first, whether the findings of the state administrative body are preclusive on Carter's Title VII claim, *see University of Tennessee v. Elliott*, 478 U.S. 788, 796, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986); and second, whether the evidence would be admissible at trial. *See Barfield v. Orange County*, 911 F.2d 644, 649 (11th Cir. 1990); *see also Arroyo v. WESTLB Administration, Inc.*, 54 F. Supp. 2d 224, 230 (S.D.N.Y. 1999); *Bradshaw v.*

---

[110] *Id.*, Tab 6 (Employee termination report).

[111] *Id.*, Tab 10 (Carter deposition), at 71.

[112] *Id.*, Tab 4 (Decision on Unemployment Compensation Claim), at 2.

[113] Amended Plaintiffs' Response in Opposition at 20.

*Golden Road Motor Inn*, 885 F. Supp. 1370, 1372 (D. Nev. 1995). This second issue is important because, in adjudicating a motion for summary judgment, courts may only consider evidence that would be admissible at trial. *See, e.g., Victoria L. by Carol A. v. District School Board*, 741 F.2d 369, 373 (11th Cir. 1984).

First, the law is fairly well-developed on the question of the preclusive effect of state administrative reports. As Carter correctly observes in her brief to the court, a judicially unreviewed "state unemployment compensation finding will not have preclusive effect concerning the defendants['] pretextual defense."[114] The Supreme Court has held quite clearly that decisions of a state administrative agency that have not been judicially reviewed — like the ADIR report tendered here — do not have preclusive effect on an employee's Title VII discrimination claims. *See, e.g., Elliott*, 478 U.S. at 796, 106 S.Ct. at 3225 ("[W]e conclude that ... Congress did not intend [for judicially] unreviewed state administrative proceedings to have preclusive effect on Title VII claims."); *Astoria Federal Savings and Loan Association v. Solimino*, 501 U.S. 104, 110, 111 S.Ct. 2166, 2171, 115 L.Ed.2d 96 (1991) (judicially unreviewed state administrative findings do not have preclusive effect on a plaintiff's ADEA claim); *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 470 n.7, 102 S.Ct. 1883, 1891 n.7, 72 L.Ed.2d 262 (1982) (holding that it was "clear that *unreviewed* administrative determinations by state agencies ... should *not* preclude ... review [in federal court] *even if such a decision were to be afforded preclusive effect in a State's own courts*") (emphasis supplied); *see also, e.g., Delgado v. Lockheed-Georgia Co.*, 815 F.2d 641, 647 (11th Cir. 1987) (declining to "grant preclusive effect to the unreviewed agency determinations").[115]

---

[114] *Id.*

[115] *See also Shields v. Bellsouth Advertising and Publishing Co.*, 228 F.3d 1284, 1289 n.6 (11th Cir. 2000) (distinguishing *Delgado*, which denied judicially unreviewed state agency decisions preclusive effect).

43

The case law is not as clear on the second issue, namely whether such administrative findings are admissible for purposes of trial. As above, this inquiry's import stems from the fact that this court cannot consider the ADIR report in making its determination on the motion for summary judgment unless the ADIR report would be admissible at trial. *See, e.g., Victoria L. by Carol A.*, 741 F.2d at 373 ("In adjudicating a motion for summary judgment, a court may consider any evidence that would be admissible at trial."); *Samuels v. Doctors Hospital, Inc.*, 588 F.2d 485, 486 & n.2 (5th Cir. 1979); *Broadway v. City of Montgomery*, 530 F.2d 657, 661 (5th Cir. 1976) ("Evidence [that is] inadmissible at trial cannot be used to avoid summary judgment."); *Roucher v. Traders & General Insurance Co.*, 235 F.2d 423, 424 (5th Cir. 1956) ("[E]vidence inadmissible on a hearing of the case would generally be inadmissible on a motion for summary judgment, except that the court may hear the matter on affidavits...."); *Soles v. Board of Commissioners of Johnson County, Georgia*, 746 F. Supp. 106, 110 (S.D. Ga. 1990) ("The court may consider only that evidence that would be admissible at trial.").

The Eleventh Circuit first addressed this issue in *Barfield v. Orange County*, 911 F.2d 651 (11th Cir. 1990). That court considered, in part, the race discrimination claim of a former sheriff's department employee who sought to exclude the findings contained in an EEOC determination letter and a decision by the Florida Unemployment Appeals Commission, which had determined that Barfield was not entitled to unemployment benefits because she had been discharged for "misconduct in connection with work." 911 F.2d at 649. Barfield contended that the reports amounted to hearsay, and would be unduly prejudicial in a jury trial. *Id.* This court is presented with the same evidentiary issue.

Federal Rule of Evidence 803 provides for exceptions to the hearsay exclusion contained in

44

Federal Rule 801. Rule 803(8) contains the so-called "public records and reports exception":

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however in criminal cases matters observed by police officer and other law enforcement personnel, or (C) *in civil actions* and proceedings against the Government in criminal cases, *factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.*

Fed. R. Evid. 803(8) (emphasis supplied). This rule permits district courts to admit into evidence "administrative findings assessing claims of employment discrimination." *Barfield*, 911 F.2d at 650 (citing *Chandler v. Roudebush*, 425 U.S. 840, 863 n.39, 96 S.Ct. 1949, 1961 n.39, 48 L.Ed.2d 416 (1976)).

Although the *Barfield* Court focused on the admissibility of an EEOC determination letter, the Eleventh Circuit specifically noted that Rule 803(8)(C) "makes no distinction between federal and nonfederal offices and agencies ...." *Barfield*, 911 F.2d at 650-51 n.7. Accordingly, *Barfield*'s discussion regarding the admissibility of the EEOC determination letter under Rule 803(8)(C) was applicable also to the admission of the report of the Florida Unemployment Appeals Commission. *Id.*

The *Barfield* Court ultimately determined that both reports *could be* admitted, due to their "highly probative" nature, but added that the district court had the "sound discretion" to make that decision in light of the "many variables" that such reports present. *Id.* at 650. The Eleventh Circuit did not support a *per se* rule that such reports should be admissible in every case, because district courts might need to consider  the reports' trustworthiness and prejudicial effect in a jury trial setting. *Id.* (citing Fed. R. Evid. 403).

45

While the district court in *Barfield* admitted the findings of the Florida Unemployment Appeals Commission, and the appellate court held that there was no abuse of discretion in its doing so, it should be noted that *Barfield* is immediately distinguishable from the case at bar. *Id.* at 651. This is because the report of the Florida Unemployment Appeals Commission had been judicially reviewed, and affirmed, by Florida's Fifth District Court of Appeal. *Id.* at 649. In contrast, the ADIR report at issue here has not undergone this additional level of scrutiny, and is instead a *judicially unreviewed* administrative finding.

Even so, federal courts have admitted similar, judicially unreviewed administrative decisions regarding unemployment benefits into evidence. *See, e.g., Arroyo v. WESTLB Adminstration, Inc.*, 54 F. Supp. 2d 224, 230 (S.D.N.Y. 1999)[116] (relying for the same proposition on *Altman v. Port Authority of New York & New Jersey*, 879 F. Supp. 345, 349 (S.D.N.Y. 1995), and *Fitch v. R.J. Reynolds Tobacco Co.*, 675 F. Supp. 133, 138 (S.D.N.Y. 1987)). In *Arroyo*, in which the plaintiff complained that he had been discriminated against on the basis of his race in violation of Title VII, the Southern District of New York acknowledged that the unemployment decision of the New York State Unemployment Insurance Appeals Board would be admissible. *Id.* at 230.

Despite the *Arroyo* decision, and others like it, this court finds that the ADIR report at issue here is not admissible, and thus cannot be considered for purposes of summary judgment. In *Walker v. Nationsbank of Florida N.A.*, the Eleventh Circuit emphasized that it was "well aware of the limits and vagaries of administrative determinations" and of the possibility of prejudice that such administrative findings could engender in a jury setting. 53 F.3d 1548, 1554 (11th Cir. 1995) (citing

---

[116] The plaintiff there sought to offer the report of the New York State Unemployment Insurance Appeals Board, which determined that Arroyo had resigned from his job with good cause and awarded him unemployment benefits. 54 F. Supp. 2d at 230.

46

*Barfield*, 911 F.2d at 651). The Eleventh Circuit has also relied on the Eighth Circuit's decision in *Johnson v. Yellow Freight System, Inc.,* in casting aspersions on the reliability of such administrative reports. That court stated that "EEOC determinations are not homogenous products; they vary greatly in quality and factual detail." 734 F.2d 1304, 1309 (8th Cir. 1984).

The ADIR report summarizes the findings from a February 18, 1998 hearing on the matter of Carter's eligibility for unemployment benefits. A number of facts, or omissions rather, are immediately troubling. First, the ADIR report relies on Code of Alabama § 25-4-78(3)(b) for its finding that Carter was not guilty of misconduct on the job.[117] That statutory provision provides that a claimant is not entitled to unemployment benefits if she was "discharged from [her] most recent bona fide work for actual or threatened misconduct committed in connection with [her] work ... *repeated after previous warning to the individual*."[118] But, while the ADIR report defines misconduct ("conduct evincing a deliberate, willful, or wanton disregard of an employer's interests or of the standards of behavior the employer has a right to expect of employees"), and finds that "the evidence does not support the allegation the claimant was not working but talking for an extended period of time," there is no discussion of any previous warnings given to Carter about her conduct on the job.[119] Evidence presented here, however, clearly establishes that Carter had received previous warnings about her job performance.[120]

Similarly, the ADIR report discusses only the December 30, 1997 complaint levied against

---

[117] Plaintiffs' evidentiary submission, Tab 4 (Decision on Unemployment Compensation Claim), at unnumbered page 1.

[118] Ala. Code. § 25-4-78(3)(b) (1975) (emphasis supplied).

[119] Plaintiffs' evidentiary submission, Tab 4 (Decision on Unemployment Compensation Claim).

[120] *See supra* text accompanying notes 83-90.

47

Carter,[121] and refers to no other incident of Carter's alleged misconduct. There is no indication that the Alabama Department of Industrial Labor Relations considered these other incidents in making its February 18, 1998 determination.

Further, this court and the unemployment compensation hearing officer are faced with different issues. The question there was whether Carter was guilty of "misconduct" and, thus, not entitled to unemployment compensation benefits; the question here, alternatively, is whether her employer discriminated against her on the basis of her race in violation of Title VII. *See Arroyo*, 54 F. Supp. 2d at 230. More specifically, the ADIR report does not address the issue of whether MCC's client, Castner-Knott, had complained about Carter not working and talking with other employees for an extended period of time. These dissimilar inquiries also necessarily implicate differing standards of review.

As another district court has written, "[u]nemployment benefits hearings are designed to be quick and inexpensive," and "if the parties knew the decision would be admitted ... in the federal lawsuit," the parties "would have every incentive to turn the hearing itself into a full-blown lawsuit." *Bradshaw*, 885 F. Supp. at 1375; *see also Arroyo*, 54 F. Supp. 2d at 230. Instead, the ADIR report was less than two full pages in length, and appears to rely solely on the testimony of no more than four witnesses, if that many: the persons appearing at the hearing are described only as "claimant with witness and employer representative with observer."[122] *See Arroyo*, 54 F. Supp. 2d at 230. Also important is the fact that the "hearing officer or board [in an unemployment compensation hearing] will typically have no special competence in deciding claims of discrimination." *Bradshaw*,

---

[121] Plaintiffs' evidentiary submission, Tab 4 (Decision on Unemployment Compensation Claim), at unnumbered pages 1-2.

[122] *Id.* at unnumbered page 1.

885 F. Supp. at 1374.

This court thus declines to take into substantive consideration the findings of the Alabama Department of Industrial Relations in its February 18, 1998 report regarding Carter's conduct as a Castner-Knott employee. Further, without more, this court is unable to find that Carter has met her burden as to the third part of the *McDonnell Douglas* test.

## III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is due to be granted. An order consistent with this memorandum opinion shall be issued contemporaneously herewith.

DONE this __8ᵗʰ__ day of November, 2001.

United States District Judge

49